IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA WESTERN DIVISION
Case No. 5:18-CV-119-FL

| | | |
|---|---|---|
| WALTON MEDIA GROUP, LLC, | ) | |
| a North Carolina Limited Liability Company, | ) | |
| and ALICIA NICOLE WALTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | **SECOND** |
| | ) | **AMENDED COMPLAINT** |
| TEXTUREMEDIA, LLC, | ) | |
| a Delaware Limited Liability Company, | ) | |
| f/k/a NATURALLYCURLY.COM, INC., and | ) | |
| DEBORAH INTERNATIONAL BEAUTY, LTD, | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

Pursuant to the parties' October 16, 2018 stipulation under Rule 15(a)(2) of the Federal Rules of Civil Procedure, and for their Second Amended Complaint, the above-captioned plaintiffs do hereby aver and say:

## BACKGROUND AND OPERATIVE FACTS

1.      Prior to 2008, plaintiff Alicia Nicole Walton ("Walton") was a full-time licensed psychotherapist. Walton's specialty as a Masters-degreed psychotherapist was helping women ages 18-34 cope with depression and anxiety disorders. Many of Walton's clients were young black women living in low-income housing. Walton's psychotherapy clients typically faced serious challenges in their lives. Walton discerned, through her work and training, that her clients' challenges were often a function of their self-image. Walton learned, in particular, that many African-American women had self-esteem problems that arose out of the social implications of their hair-style choice. Walton, somewhat surprisingly, found herself talking to clients about their hair as a function of their self-

esteem. These discussions caused Walton to think back to her own experiences with her own hair as she grew into adulthood.

2.  Growing up, Walton recalled that she sometimes only felt pretty when her hair was straight. When Walton got to college (located in a very small town), her then-boyfriend (now husband) would drive her many miles to the nearest hair salon. At one point, Walton's boyfriend commented that her self-esteem seemed to fluctuate with the state of her hair – outspoken and confident when her hair was straight, withdrawn and kind of sad when her hair was curly.

3.  As a psychology major in college, Walton recognized the truth about her boyfriend's observations about her. And then, in talking to her friends, Walton discovered that many of her African-American classmates had experienced similar emotions and reactions with respect to their hair. All of this prompted Walton to think about why she liked her natural curly hair better (as opposed to how it looked ironed or chemically straightened), and this led her to embrace her naturally curly hair, to research the science of how best to care for curly hair, and to train herself how to best care and nurture her own hair.

## WALTON STARTS CURLYNIKKI.COM

4.  Over the years, Walton had joined a number of online hair care forums, and she had begun actively participating in the discussions that took place there. Walton's postings on those forums gained popularity, and she, in turn, began to be known as an authority on issues related to the care of curly hair. Curly-hair forum posters began encouraging Walton to start her own website. Shortly thereafter, in 2008, Walton (at the time, Walton was a 25-year-old full time psychotherapist) established the "CurlyNikki.com" website – where she began offering online advice to women with hair like hers.

5.  At first, Walton's "CurlyNikki.com" website operated primarily as a "blog." Her blog focused on helping women gain confidence in their ability to style their hair. Walton wrote postings

to help women save time, money, and energy on styling their hair. Walton knew that women like her faced specific styling difficulties if they chose to wear their hair naturally (that is, without flattening and smoothing their hair with an iron or with chemical products). Walton also knew that some women had suffered heat or chemical damage from flattening their hair, and so she began to post advice on how to build back natural and healthy hair.

6.    Walton began advocating for women to educate themselves about various hair products and treatments, which led to a measurable growth in women demanding natural hair care products in place of the chemical relaxers that had been detrimental to the overall health of their hair. As the audience for CurlyNikki.com grew, the website's content and sophistication grew, and the website's visitors expressed their desire to meet Walton in person.

## THE WEBSITE SUCCEEDS AND GROWS EXPONENTIALLY

7.    In response to the rising popularity of her website, Walton started meeting with handfuls of her blog readers at local restaurants and lounges in order to swap products, to share hair ideas, and to have "girls' nights." The meet-ups became popular, so women in the CurlyNikki.com community began hosting their own "meet-ups." Pretty soon, Walton was travelling across the country to host corporate sponsored meet-ups with women that had benefitted from the CurlyNikki.com website. Hundreds of women began to show up at the meet-ups hosted by Walton in the United States.

8.    Walton's success with CurlyNikki.com, however, was not limited to the United States. Walton also began receiving emails from women all over the world requesting meet-ups in their own countries, or wanting Walton's help in promoting their community and service-based initiatives. Walton learned from these contacts that women in the international community often had difficulty obtaining natural hair products. To meet these needs, Walton began conducting philanthropic, media

content, and promotional events in more than a dozen countries in South America, Africa, Europe, and Asia.

9.      By 2010, CurlyNikki.com had become the most heavily trafficked natural hair website in the world. That volume of traffic made CurlyNikki.com attractive to Internet advertisers and gave Walton prominence as a "social media influencer." Walton's success with CurlyNikki.com did not go unnoticed by other important influencers in the American media. Walton soon found herself sharing her message and outlook with print media outlets such as The New York Times, Forbes magazine, USA Today, The Washington Post, InStyle magazine, Ebony magazine, Essence magazine, The Guardian, Madame Noire, and Parents Magazine. Dozens of television appearances followed, including the TODAY show, ABC's Nightline, The Tyra Banks Show, The Katie Couric Show, The Steve Harvey Show, and many others.

10.      Walton gained considerable recognition through her more than 50 nationally televised appearances. Walton has been a guest of, or a consultant for, every major American television network as well as several cable networks (i.e. NBC, CBS, ABC, CNN, MSNBC). Walton's most recent appearance was on the popular daytime television show, "Dr. Oz." This appearance on Dr. Oz took place on July 13, 2018, and during the show Walton and Dr. Oz talked about "What Stress & Anxiety Can Do to Your Hair." Walton has authored best-selling books as well. In 2013, Harper Collins published her best-selling book, "Better Than Good Hair. In 2016, L'Oreal published her book, "When Good Hair Goes Bad." This kind of attention has made Walton one of the most sought-after experts on the subject of hair care beauty in the United States.

11.      In late 2010 representatives from defendant NaturallyCurly.Com, Inc. contacted Walton, expressed an interest in her and her website, and travelled to meet with her at her home in Raleigh, North Carolina. At the time, NaturallyCurly.Com, Inc. ("NCCI") owned the website

"NaturallyCurly.Com." By this time, the CurlyNikki website was generating thousands of dollars a year in advertising and related revenue.

12.     As the "NaturallyCurly.Com" name suggests, that website was, like CurlyNikki.com, dedicated to topics of concern or discussion among women with naturally curly hair. By developing and acquiring Internet assets in the natural curly hair space (and similar), NCCI had become one of the "largest hair and beauty content and eCommerce platform[s]." The mutuality of focus between the CurlyNikki and the NaturallyCurly website platforms prompted Walton and NCCI to discuss ways to move forward in business together.

13.     NCCI knew what it was doing. Acquiring access to social media "influencers," like Walton, with millions of followers (and the Internet website traffic that goes with her), is one way that companies like NCCI drive their Internet advertising business. Another way that companies like NCCI make money is by endorsing products; and NCCI believed that Walton could help it grow its product endorsement business.

## WALTON AND NCCI COMBINE FORCES

14.     Over the course August and September of 2010, Walton and NCCI discussed various ways they might combine forces. These discussions, such as the meeting that took place in Raleigh, led to a series of different business arrangements between them. After securing Walton as part of the NCCI team, NCCI continued to raise venture capital from backers such as John Paul DeJoria, the billionaire owner of John Paul Mitchell Systems, and Jimmy Treybig, founder of Tandem Computers. Other investors joined the NCCI platform over the course of 2011, including the Golden Seeds Network, a New York-based investing group that focuses on businesses owned and run by women.

15.     From 2010 through roughly the Fall of 2015, Walton and NCCI continued to work together. The relationship between Walton and NCCI was not perfect, though, and the quality of the relationship waxed and waned in a variety of ways. There was often tension between NCCI's business

approach and Walton's efforts to preserve the integrity of her brand and her relationship of trust with her Internet following.

## TEXTUREMEDIA SECRETLY SHOPS THE COMPANY

16.    TextureMedia, Inc. ("TextureMedia"), the parent company of NCCI, began shopping its portfolio of assets in 2013. To do so, TextureMedia engaged DCS Advisory (formerly the "Signal Hill Capital Group, LLC"), a global investment banking firm, to broker a sale of the company. At the time this occurred, TextureMedia's retention of DCS Advisory, and TextureMedia's decision to sell the company, had not been disclosed to Walton.

17.    Then on or about August 14, 2015, Michelle Breyer ("Breyer"), the co-founder of NaturallyCurly.Com, requested an immediate meeting with Walton. Walton was in St. Louis, and Breyer flew in from Texas to meet her there. During this meeting, Breyer represented to Walton that TextureMedia was on the brink of insolvency. Breyer represented that TextureMedia had an urgent need for capital and had only one available buyer, a New York-based distributor of hair care and beauty products known as "Ultra/Standard" (formally, "Ultra Standard Distributors, Inc." and f/k/a "Olla Beauty Supply, Inc."). Absent Ultra/Standard's immediate purchase, Breyer said, TextureMedia could not continue operations. Breyer told Walton that her relationship with TextureMedia would fundamentally change, in a good way, as a result of the Ultra/Standard purchase. Breyer's dire representations about TextureMedia's financial condition came as a complete shock to Walton.

## TEXTUREMEDIA'S PROMISES AND REPRESENTATIONS

18.    During their mid-August, 2015 meeting in St. Louis, Breyer asked Walton to support the acquisition of TextureMedia by Ultra/Standard. Breyer told Walton that, without Walton's support, the sale might not go through. And without the sale, Breyer said, TextureMedia would probably fail. Walton's initial reaction to Breyer's pressurized request was surprise and anger. Walton was surprised because she had not been previously apprised of Breyer's effort to sell the company.

Walton was also angry because TextureMedia had allowed her website to fall into disrepair (*e.g.*, "dead links," "stale" content), and because TextureMedia had been putting increasing pressure on Walton to promote products and activities that were inconsistent with the relationship between her and her Internet base.

19.    In response, Breyer promised that – if Walton publicly supported the sale of TextureMedia to Ultra/Standard, Walton would be given an equity and control position in the post-acquisition entity formed for purposes of the Ultra/Standard transaction (*i.e.*, defendant TextureMedia, LLC a/k/a "TMI Media, LLC"). Breyer promised that, if Walton supported the acquisition, she would be treated as a "partner" in the new Ultra/Standard enterprise, and that her relationship with the newly formed company would put her on executive footing with any other "partners" in that company. Breyer also represented that, by supporting the Ultra/Standard acquisition, Walton's previous commitments to TextureMedia would be entirely supplanted, replaced, and changed – on favorable terms - to reflect her partnership in the newly formed company.

20.    Breyer then offered to set up a meeting between Walton and executives from Ultra/Standard so she could question them directly about her role in the new "TextureMedia" company (that would be formed through the acquisition). Walton agreed to this meeting, and it occurred in mid-August of 2015, in the Bellport, New York offices of Ultra/Standard and Deborah International Beauty, Ltd. ("DBIL"). That meeting was attended by, among others, Breyer (of TextureMedia); Ryan Alberta ("Alberta"), the vice president of Ultra/Standard; and Michael Ross ("Ross"), the president of Ultra/Standard and the vice president and representative of DBIL. By this time, the successor entity to TextureMedia had already been formed, and had been named "TextureMedia, LLC" ("TMLLC"). TMLLC, as formed, would be under the 100% voting control of DBIL (through Ross). During this meeting, Breyer, Alberta, and Ross made the following

representations, as promoters, agents, and those in control of TMLLC (e.g., DBIL), together and separately, and in sum and substance:

(a)    That Walton would be made the "Head of Content Development" at the newly formed company, TMLLC, and would thereby be placed in actual control of *content development* at TMLLC (exactly as the title suggests);

(b)    That the newly formed company, TMLLC, would, consistent with prevailing industry standards, fund, maintain, and promote CurlyNikki.com to generate revenue from the sale of advertisements and retail products on the website;

(c)    That TMLLC would make Walton a "partner" in the new company and would share revenue from that company with her on a predetermined basis (consistent with accounting for TMLLC based on prevailing professional accounting standards and based on a formula for determining payout distributions);

(d)    That TMLLC would not make CurlyNikki endorsements for products or services without Walton's permission;

(e)    That TMLLC would not post content on the CurlyNikki website without first consulting with Walton and then obtaining her permission or approval to do so;

(f)    That TMLLC would only post content on the CurlyNikki website that was consistent with the content posted by Walton on the website during the previous five years;

(g)    That TMLLC would treat Walton as a partner in the enterprise, would include her in all material decisions with respect to the CurlyNikki website, would keep her advised about all material decisions made with respect to TMLLC, and would keep her apprised about the financial condition of the CurlyNikki website and the financial condition of TMLLC;

(h)    That Walton would, irrespective of any prior arrangements with NaturallyCurly.Com, Inc., have full control and ownership over the rights to her own persona, have control over the

development of content at TMLLC, and that she would be compensated consistent with her "partnership" status in the new enterprise (*i.e.*, Walton's compensation would be reflected through guaranteed payments on a TMLLC K-1; Walton also understood that in the LLC context she would technically be a "member" of the LLC); and,

(i)     That TMLLC would, at all times, promote Walton in a positive light, and not dilute or harm her CurlyNikki brand.

21.     Shortly after this meeting, Ultra/Standard drafted and presented Walton with a limited liability company agreement (the "LLC Agreement") for TMLLC that would make her a 2.5% non-voting member of that (newly formed) company. The LLC Agreement appeared consistent with the representations made by Breyer, Alberta, and Ross during Walton's recent meeting with them in Bellport. The LLC Agreement stated:

(a)     That it "superseded . . . all other agreements and understandings, written or oral, with respect to its subject matter;"

(b)     That Walton would be instated as the "Head of Content Development" at TMLLC;

(c)     That the subject matter or purpose of the LLC Agreement "shall be [to form a company, TMLLC] to engage, directly or through one or more Affiliates, in the business of operating a variety of Internet social platforms and e-commerce sites under various hair care related brands and trade names providing content in the textured and curly hair arena, advertising opportunities for vendors and beauty care products and services, and e-commerce selling opportunities for the [TMLLC], and any other business or activity that may be legally permitted under the [Delaware Limited Liability Company] Act.;"

(d)     That the "Members will cause the [TMLLC] to fulfill its obligations under this Agreement;"

(e)     That any member of TMLLC "may take advantage of any business opportunity that becomes available to such Member or Affiliate thereof, whether or not related to the Company's Business, without offering such business opportunity to the Company;"

(f)     That, in pertinent part, the "Members owning Non-Voting Units shall be entitled to distributions from [TMLLC] as follows . . . [because] the Company shall be required to make quarterly cash distributions of, or apply, the portion of the Company's projected annual taxable income allocable to the current calendar quarter based on the performance of the Company to date ("Quarterly Income") in the following proportions: (A) forty percent (40%) to the Non-Voting Members on a pro rata basis in accordance with the Members Non-Voting Percentage Interests . . . .;"

(g)     That TMLLC "shall keep and maintain accurate and complete books and records of accounts, which books and records shall be maintained in accordance with United States generally accepted accounting principles;"

(h)     That TMLLC "shall cause each Member to be furnished with . . . financial statements [that] must be prepared in accordance with United States generally accepted accounting principles consistently applied;"

(i)     That the LLC agreement "constitute[s] the entire agreement of the Members relating to [TMLLC] and supersedes all prior contracts or agreements with respect to the Company, whether oral or written."

22.     Based on representations in paragraph 21 (a)-(i), and the other similar material representations made by Breyer, Alberta, and Ross at the Bellport meeting at Ultra/Standard/DBIL, Walton agreed to support the TextureMedia acquisition. Walton also agreed to sign on as a "member" of and as the "Head of Content Development" of TMLLC.

## ULTRA/STANDARD ACQUIRES TEXTUREMEDIA

23.     On or about September 21, 2015, NCCI's parent company, TextureMedia, was acquired by Ultra/Standard. DBIL thereby assumed 100% voting control over TMLLC. In reliance upon the prior representations made by Breyer, Alberta, and Ross, and TMLLC (orally and through the LLC Agreement), Walton had already executed and agreed to the LLC Agreement. Remarkably, TextureMedia compensated its preferred shareholders as much as $4.05 per share in net payouts from the Ultra/Standard acquisition proceeds – while compensating TextureMedia's common shareholders (like Walton, who owned 30,384 shares of common) at the insulting and probably unlawful rate of $0.00 per share. *See Carsanaro v. Bloodhound Technologies, Inc.*, 2013 WL 1104901 (Del. Ch. Mar. 15, 2013)(wrongful self-interested allocation of merger proceeds to preferred shareholders at the expense of and without due regard to the common shareholders). But the irony did not stop there.

24.     On September 21, 2015, Ultra/Standard and TMLLC put this statement in their post-acquisition press release: "Nikki Walton, founder of and Head of Content Development for CurlyNikki.com, states, 'When I joined forces with NaturallyCurly in 2010, my goal was to find capable partners and a business model that would spur growth while protecting the integrity of CurlyNikki.com for my consumer community. I think we've successfully accomplished that. I'm also satisfied that the Ultra/Standard acquisition of TextureMedia is consistent with my original goals.'" This statement, drafted by Ultra/Standard and TMLLC, reflected what Walton believed was the meeting of the minds on which the LLC Agreement had been reached.

## TEXTUREMEDIA RENEGES

25.     It quickly became clear, however, that DBIL and TMLLC never intended to fulfill the promises that had been made by Breyer, Alberta, Ross, and TMLLC to induce Walton's support for the TextureMedia acquisition (including but not limited to Walton's execution of the LLC Agreement). Despite the LLC Agreement's description of Walton as TMLLC's "Head of Content Development,"

Crista Bailey ("Bailey"), the new "CEO" of TMLLC, immediately began making unilateral changes to the development of content on CurlyNikki.com. At the time Bailey started taking these actions, the ink was barely dry on the LLC Agreement. Bailey's actions, of course, were all subject DBIL's complete control and direction.

26.     For years, Walton had used such guest bloggers to "scale" content on the website. Walton is considered a pioneer of the "guest blogger" content model, and she relied on this technique to produce "economies of scale" and to keep content fresh on the website. Bailey, however, told Walton that she could no longer use "guest bloggers" to do this for the CurlyNikki.com website. Bailey also told Walton that TMLLC planned to devote no more than $450.00 in funding to the website per month. Walton viewed this as a patently absurd budget for a website that historically averaged $400,000 to $700,000 in advertising revenue per year. To place this in context, the monthly budgetary allocation for NaturallyCurly.com had been in the range of $60,000 - $100,000, and included funding for eleven (11) editors, free-lance writers, social media promotional campaigns, and consumer giveaways.

27.     Bailey, DBIL, and TMLLC also caused the CurlyNikki.com website to fall into a state of dramatic disrepair - as evidenced by hundreds of "dead" links that began appearing on the website. In March 2017, TMLLC's own technical expert conducted an audit of the CurlyNikki.com website. The TMLLC auditor concluded that TMLLC had failed to maintain the competence of the CurlyNikki.com website and that the CurlyNikki.com website had fallen into a state of disrepair.

28.     Bailey, DBIL, and the executive team at TMLLC then began a campaign to cause Walton to stop making appearances on shows like "The Dr. Oz Show" (which at the time was daytime television's number one show). By about this time, Walton had become Dr. Oz's most frequently

recurring guest. They told Walton she should appear more often, instead, on shows with predominately African-American viewers like "The Steve Harvey Show." This more or less racial approach made no sense to Walton. Walton, to the contrary, had worked for years to expand her brand's reach beyond racial categorization.

29. Confused by Bailey's conduct, Walton requested a meeting with Bailey and Ultra/Standard's president and DBIL's vice president, Michael Ross. Bailey refused to convene such a meeting. Walton then called Ross directly, whereupon Ross stated that it was "Bailey's job to allocate funds as she sees fit and that he would not interfere with her conduct." Shortly thereafter, however, Bailey was removed as Walton's primary point of contact at TMLLC, and shortly after that, Bailey departed as "CEO" from TMLLC (this occurred in January of 2017).

30. With the departure of Bailey from TMLLC, Walton hoped that circumstances at TMLLC would enter a more productive phrase. But ultimately the circumstances only changed for the worse.

31. In March 2017, TMLLC told Walton that it would increase the funding of the CurlyNikki.com website, improve site maintenance on CurlyNikki.com, re-launch forums on CurlyNikki.com (which TMLLC had previously eliminated), and launch a new CurlyNikki.com mobile application – but only if Walton agreed to make personal appearances for TMLLC (meaning TMLLC's business lines unrelated to her), and only if Walton would agree to personally promote a book authored by TMLLC executive Michelle Breyer, entitled "Curl Revolution." The nature of TMLLC's demands, in the context of the existing situation, indicated that TMLLC and DBIL had decided to "ransom" the maintenance and operational competence of the CurlyNikki.com website in order to force Walton to personally endorse TMLLC's products, personnel, and other third parties.

32.     After the Ultra/Standard acquisition of TextureMedia, TMLLC continued the use of Walton's likeness and the CurlyNikki name to endorse Ultra/Standard products and business lines and to otherwise secure advertising and retail revenue - without consulting Walton or even asking her if she would voluntarily make any such endorsements. Such campaigns deceptively suggested to consumers that Walton had endorsed specific products in the TMCLLC online store, "Shop Naturally Curly," when in fact Walton had not, *e.g.*, "Nikki's Picks." Likewise, TMLLC continued using logo designs to sell its products by mimicking (that is, that by "knocking-off") the styling of Walton's first book, "Better Than Good Hair." Other offerings like a "CurlyNikki Conditioning Cocktail" – were posted without any actual support or endorsement from Walton. Walton repeatedly asked TMLLC and its predecessor company to stop this and similar conduct. But the conduct did not cease. TMLLC's unilateral conduct, caused by DBIL, of course, made a mockery of Walton's title and purported role as TMLLC's "Head of Content Development."

33.     In the latter part of 2016, TMLLC effectively "demonetized" the CurlyNikki.com website, and DBIL caused TMLLC to begin diverting advertising revenue away from CurlyNikki.com to other websites in the Ultra/Standard portfolio. In response, Walton made a variety of attempts and entreaties to change DBIL's course of conduct vis-à-vis TMLLC. DBIL's response was to exclude Walton from TMLLC's business affairs and any meaningful role at the company.

## TEXTUREMEDIA'S FINANCIAL REPORTING GOES DARK

34.     Since Ultra/Standard's acquisition of TMLLC in 2015, TMLLC has sporadically issued IRS Partnership Forms K-1 to Walton. The first K-1 was issued to Walton by TMLLC, for a period running from July to October of 2015, in the name of Walton Media Group, LLC (plaintiff "WMG" is an entity owned by Walton). TMLLC has issued only one other K-1 to Walton/WMG, even though

two tax years have since passed (*i.e.*, 2016 and 2017). No explanation has ever been offered for this failure.

35.     TMLLC, under DBIL's sole control, has likewise failed to provide Walton the GAAP financials mandated by the LLC Agreement. No explanation has ever been offered for this failure.

36.     TMCLLC, under DBIL's sole control, has failed to make partnership distributions to Walton in the manner called for by the LLC Agreement. No explanation has ever been offered for this failure.

37.     Due to the foregoing conduct, and other similar conduct, plaintiffs were left with no choice other than to file this action.

## THE PARTIES

38.     Plaintiff Alicia Nicole Walton ("Walton") is an individual whose principal residence is located in the District of Columbia. At relevant times, Walton resided in Raleigh, North Carolina, and she maintains an active CurlyNikki-related office there (from which WMG operates).

39.     Plaintiff WMG is a limited liability company organized under the laws of North Carolina, with its principal office located in Raleigh. WMG is an alter ego of Walton. WMG and Walton are therefore referred to interchangeably in this Second Amended Complaint.

40.     Walton is the managing member and owner of WMG.

41.     TMLLC issued its sole K-1 to Walton through WMG.

42.     Defendant TextureMedia, LLC, also known as "TMI Media, LLC," is a limited liability company that was formed under the laws of the State of Delaware on July 15, 2015 (this company has been previously referred to herein as "TMLLC"). TMLLC's principal place of business is located in Austin, Texas.

43. Defendant Deborah International Beauty, Ltd. ("DBIL"), is a New York corporation, with its principal place of business located in Bellport, New York. Defendant DBIL is the only voting member of TMLLC (a closely-held company). DBIL's role as the sole voting member of TMLLC gives it total control over the company. DBIL acts through Ross with respect to DBIL's role as the sole voting and controlling member of TMLLC. Actions and representations by Ross, as referred to in this Second Amended Complaint, are therefore attributable to DBIL.

## JURISDICTION AND VENUE

44. The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332. The amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs. And there is complete diversity among the named parties.

45. The Court has personal jurisdiction over defendants TMLLC and DBIL. TMLLC and its agent, DBIL, conduct business and their affairs in this judicial district. TMLLC, by itself and/or through its agents and/or predecessors in interest, has done continuous and systematic business in the State of North Carolina. TMLLC, by itself and/or through its agents and/or predecessors in interest, such as DBIL, conducted numerous business transactions with Walton while she was a resident of or was living in Raleigh, North Carolina. TMLLC, by itself and/or through its agents and/or predecessors in interest, such as DBIL, also conducted numerous business transactions with WMG, a North Carolina company (and many of these transactions took place with WMG while WMG was actively operating in the State of North Carolina). Walton and WMG, over a period of years, ran the CurlyNikki.com website (for the benefit of TMLLC and/or its predecessors in interest) from their residence and place of business in Raleigh. TMLLC and/or its predecessors in interest, and agent DBIL, initiated its business relationship with Walton while Walton was a Raleigh resident and with

WMG while WMG was conducting its operations from the State of North Carolina. TMLLC and/or its predecessors in interest, through its multiple websites, and subscribers to those websites, and otherwise, does regular and systematic business with residents of North Carolina (including soliciting and entering into business relationships with North Carolina residents).

46.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and because: (i) during the relevant period, WMG maintained its principal place of business in Raleigh; (ii) a substantial portion of plaintiffs' claims arose in this judicial district; (iii) a substantial portion of the facts, circumstances and omissions giving rise to this lawsuit occurred within this judicial district; (iv) WMG's damaged property interests are located in Raleigh; and, (v) defendants have engaged and continue to engage in substantial business activities within this judicial district.

## FIRST CAUSE OF ACTION
### (Fraudulent Inducement)

47.     The foregoing paragraphs are realleged.

48.     TMLLC fraudulently induced Walton to execute the LLC Agreement. Breyer, Alberta, and Ross, acting as agents of and for TMLLC, to induce Walton's execution of the LLC Agreement, made material misrepresentations of existing facts during the meetings described in paragraphs 18 through 21 of this Amended Complaint.

49.     At the time Breyer, Alberta, and Ross made the following material representations on behalf of TMLLC (as previously outlined in ¶¶ 18-21), they knew that the following representations were false when made, or made them recklessly without any knowledge of the truth, and as a positive factual assertion:

(a)     That Walton would be made the "Head of Content Development" at TMLLC, and that Walton would actually be placed in control of *content development* at TMLLC;

(b)     That TMLLC actually intended to fund, maintain, and promote CurlyNikki.com to generate revenue from the sale of advertisements on the website;

(c)     That TMLLC actually intended to make Walton a partner in the new company and to share revenue from TMLLC with her on a predetermined basis consistent with GAAP;

(d)     That TMLLC would not make CurlyNikki endorsements for products or services without Walton's permission;

(e)     That TMLLC would not post content on the CurlyNikki website without first consulting with Walton and then obtaining her permission or approval to do so;

(f)     That TMLLC would only post content on the CurlyNikki website that was consistent with the content posted by Walton on the website during the previous five years;

(g)     That TMLLC intended to keep Walton apprised about the financial condition of the CurlyNikki website and the financial condition of TMLLC;

(h)     That TMLLC actually intended to give Walton full control over content development at TMLLC, and that TMLLC intended to compensate Walton through the payment structure outlined in the LLC Agreement; and,

(i)     That TMLLC intended to promote Walton in a positive light, and to not act in a manner that was inconsistent with her CurlyNikki brand.

50.     Walton acted in complete and reasonable reliance on the foregoing representations (which were false). Walton's reasonable reliance is squarely evidenced by her execution of the LLC Agreement, which, by its terms, purportedly made her TMLLC's "Head of Content Development."

51.     Breyer, Alberta, and Ross, acting as agents of TMLLC, knew that Walton's continued presence and role as part of TMLLC were key to the success of the Ultra/Standard acquisition. To make sure Walton supported the Ultra/Standard acquisition, Breyer, Alberta, and Ross, acting as agents of TMLLC, made whatever statements were necessary to get Walton on board. Breyer, Alberta,

Ross, and TMLLC intended to induce Walton's reliance on their representations. And their efforts were successful, and their promises and representations were empty – as was borne out by the events that took place almost the day after the TMLLC acquisition occurred.

52.     At the time TMLLC fraudulently induced Walton into executing the LLC Agreement, Walton had many other opportunities she could have pursued instead, based on the status she enjoyed as one of the foremost and influential experts in the area of hair care beauty in the United States. TMLLC knew that Walton had many options. Those options were, in part, what made Walton so valuable to the Ultra/Standard deal. TMLLC's fraud caused Walton to forego those options – options foregone because of TMLLC's representations that Walton was supposedly being made the "Head of Content Development" at one of the largest hair care beauty companies in the United States. But per TMLLC's plan, what Walton actually got was a crown without a kingdom. Walton's good faith reliance on TMLLC's false promises has occurred at a substantial and demonstrable opportunity cost to her career and business. TMLLC should be made to pay substantial damages as the cost of making false representations and promises.

53.     As a direct and proximate result of defendants' fraudulent inducement, as alleged, plaintiffs have sustained damages in an amount to be proven at trial. Plaintiffs also seek the benefit of their bargain; the law requires TMLLC to put Walton, the defrauded party, in the position she would have occupied if TMLLC's representations had been true. Plaintiffs alternatively seek reliance damages, to put Walton, the defrauded party, in the position she would have occupied had the LLC Agreement never been made. To the degree that a remedy at law is inadequate or unavailable, plaintiffs seek the alternative equitable remedy of rescission of the LLC Agreement (and other ancillary relief).

## SECOND CAUSE OF ACTION
### (Breach of LLC Agreement)

54.     The foregoing paragraphs are realleged.

55. Shortly after August 25, 2015, and in reasonable reliance upon the representations referenced in the paragraphs above, Walton executed the LLC Agreement with TMLLC.

56. The LLC Agreement stated:

(a) That Walton would be instated as the "Head of Content Development" at TMLLC;

(b) That the LLC Agreement "superseded . . . all other agreements and understandings, written or oral, with respect to its subject matter;"

(c) That the subject matter or purpose of the LLC Agreement "shall be [to form a company, TMLLC] to engage, directly or through one or more Affiliates, in the business of operating a variety of Internet social platforms and e-commerce sites under various hair care related brands and trade names providing content in the textured and curly hair arena, advertising opportunities for vendors and beauty care products and services, and e-commerce selling opportunities for the [TMLLC], and any other business or activity that may be legally permitted under the [Delaware Limited Liability Company] Act.;"

(d) That the "Members [of TMLLC] will cause [TMLLC] to fulfill its obligations under this Agreement;"

(e) That, in pertinent part, the "Members owning Non-Voting Units [in TMLLC] shall be entitled to distributions from [TMLLC] as follows . . . [because] 'the Company shall be required to make quarterly cash distributions of, or apply, the portion of the Company's projected annual taxable income allocable to the current calendar quarter based on the performance of the Company to date ("Quarterly Income") in the following proportions: (A) forty percent (40%) to the Non-Voting Members on a pro rata basis in accordance with the Members Non-Voting Percentage Interests . . . ;'"

(f)     That TMLLC "shall keep and maintain accurate and complete books and records of accounts, which books and records shall be maintained in accordance with United States generally accepted accounting principles."

(g)     That TMLLC "shall cause each Member to be furnished with . . . [yearly] financial statements [that] must be prepared in accordance with United States generally accepted accounting principles ["GAAP"] consistently applied;" and,

(h)     That the LLC agreement "constitute[s] the entire agreement of the Members relating to [TMLLC] and supersedes all prior contracts or agreements with respect to the Company, whether oral or written."

57.     TMLLC has materially breached the express provisions of the LLC Agreement by, among other things: (1) Failing to instate Walton as the "Head of Content Development" at TMLLC, thereby placing her in charge of content development at TMLLC (Walton did not agree to assume an empty title, "Head of Content Development," the parties instead agreed that Walton would assume responsibilities at TMLLC consistent with that title); (2) Failing to maintain and properly "operate" the CurlyNikki website, causing it to fall into a state of abject disrepair, and thereby diminishing its ability to generate revenue to fulfill the stated objects of the LLC Agreement; (3) Failing to make quarterly cash distributions to plaintiffs from TMLLC's projected annual taxable income in the amount of forty percent (40%) (based on Walton's pro rata percentage as a non-voting member of TMLLC); and by (4) Failing to provide plaintiffs with yearly TMLLC financial statements (prepared in accordance with United States GAAP).

58.     TMLLC has also materially breached the implied covenant of good faith and fair dealing inherent to every contract, including the LLC Agreement. TMLLC has breached this implied covenant by: (1) Not fulfilling the promise to make Walton the Head of Content Development at TMLLC (other than through an empty title); (2) Not operating the CurlyNikki.com website in

accordance with industry standards and norms (thereby reducing its ability to function as a going concern); (3) Causing TMLLC to create website content at odds with the integrity of the CurlyNikki brand; (4) Making impossible time and activity demands on Walton with respect to the CurlyNikki website while simultaneously and arbitrarily reducing the operational funds available to meet those demands (*i.e.*, making it functionally impossible for Walton to carry out the website's objectives); (5) Failing to provide Walton with GAAP-based TMLLC financials to facilitate her independent assessment of TMLLC's financial affairs; (6) Failing to compensate Walton as called for by the LLC Agreement (or, alternatively, failing to explain the lack of such compensation); (7) Ransoming the operating competence and functionality of the CurlyNikki website in order to force Walton to endorse or support Ultra/Standard or TMLLC's advertising and retail endeavors (irrespective of whether Walton actually stood behind such endorsements); and, (8) Acting so as to fundamentally undermine Walton's benefit of the bargain under the LLC Agreement.

59.     As a direct and proximate result of defendants' breaches of contract, as alleged, plaintiffs have sustained damages in an amount to be proven at trial. Plaintiffs seek, for instance, the benefit of their bargain; because the law requires TMLLC to put Walton, the promisee, in the position she would have occupied if TMLLC's contractual promises had been true.

### THIRD CLAIM FOR RELIEF
**(Quantum Meruit)**

60.     The foregoing paragraphs are realleged.

61.     This claim for damages in quantum meruit lies in the alternative to plaintiffs' breach of contract claim.

62.     TMLLC requested services from plaintiffs related to the objects of the LLC Agreement and with respect to the CurlyNikki website. TMLLC agreed to compensate plaintiffs for those services.

63.     Plaintiffs provided the services that TMLLC requested and plaintiffs acted in reliance upon TMLLC's promises to compensate plaintiffs for that work. Accordingly, plaintiffs are entitled as damages to the reasonable value of the services they performed for TMLLC and for which TMLLC has not yet paid.

## FOURTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

64.     The foregoing paragraphs are realleged.

65.     This claim is solely against defendant DBIL. DBIL is the sole voting and controlling member of TMLLC, and DBIL owes a fiduciary duty to all of TMLLC's members as a matter of law. DBIL, operating through its agents and otherwise (*e.g.*, Ross), therefore owed Walton and WMG, at all relevant times, (1) a duty of care; (2) a duty of loyalty; (3) a duty to account; (4) a duty of full disclosure; (5) a duty to act fairly; and, (6) a duty of good faith and fair dealing. DBIL, through its representative Ross, and by virtue of DBIL's 100% voting control over TMLLC, breached each of the foregoing aspects of the fiduciary duty DBIL directly owed the plaintiffs. Other examples of DBIL's fiduciary breaches against plaintiffs are alleged in this Second Amended Complaint.

66.     DBIL also owed plaintiffs fiduciary duties as matter of fact. Plaintiffs placed full faith, confidence, and trust in DBIL because it was the entity in control of TMLLC (DBIL is in turn controlled by Ultra/Standard and/or Ross). Plaintiffs' relationship of trust with DBIL led up to and surrounded plaintiffs' decision to execute the LLC Agreement and to become a member of TMLLC. TMLLC is and was a closely-held company (controlled totally by DBIL), and TMLLC has no more than eleven members (and those members have extremely limited resignation rights under the LLC Agreement). DBIL became a fiduciary of plaintiffs as a matter of law, then by fact, and then DBIL breached the fiduciary duties it owed plaintiffs by way of the conduct herein alleged.

67. As alleged, DBIL failed to act in good faith and with due regard for plaintiffs' interests. DBIL ignored plaintiffs' interests in TMLLC and acted in derogation of them. DBIL's conduct was in breach of each component of the fiduciary duties alleged through this claim for relief.

68. As a direct and proximate result of defendants' breaches of fiduciary duty, as alleged, plaintiffs have sustained damages in an amount to be proven at trial. Plaintiffs seek, for instance, the benefit of their bargain; because the law requires DBIL to put Walton, who placed trust and repose in TMLLC and DBIL, in the position she would have occupied if TMLLC and DBIL had fulfilled their fiduciary duties.

## FIFTH CLAIM FOR RELIEF
### (Constructive Fraud)

69. The foregoing paragraphs are realleged.

70. This claim is solely against defendant DBIL. DBIL, as the sole voting and controlling member of TMLLC, owes a fiduciary duty to all of its members as a matter of law. DBIL, operating through Ross and its other agents, therefore owed Walton and WMG, at all relevant times, (1) a duty of care; (2) a duty of loyalty; (3) a duty to account; (4) a duty of full disclosure; (5) a duty to act fairly; and, (6) a duty of good faith and fair dealing. DBIL's conduct, as alleged, breached the foregoing fiduciary duties owed to plaintiffs. DBIL first became a fiduciary of plaintiffs as a matter of law, and then DBIL breached its fiduciary duty vis-à-vis plaintiffs by way of the conduct herein alleged.

71. DBIL also owed plaintiffs fiduciary duties as matter of fact. Plaintiffs placed full faith, confidence, and trust in DBIL, and plaintiffs therefore believed the representations that DBIL made to Walton and WMG about TMLLC. Plaintiffs' relationship of trust with DBIL led up to and surrounded plaintiffs' decision to execute the LLC Agreement and to become a member of TMLLC. TMLLC is solely controlled by DBIL, which holds 100% voting power over TMLLC, and DBIL thereby controls all actions taken by TMLLC.

72.     As alleged, DBIL failed to act in good faith and with due regard for plaintiffs' interests. DBIL's conduct was in breach of each component of the fiduciary duties alleged in paragraphs 65-68. Specifics regarding the time, place and manner of DBIL's conduct in breach is alleged above at paragraphs 18 through 21.

73.     Having gained the trust and confidence of plaintiffs, DBIL then took advantage of plaintiffs' trust and confidence, and breached its fiduciary duty to them, by using DBIL's sole control over TMMLC for its own benefit, and for the benefit of TMLLC's parent company, Ultra/Standard. By using Walton's name and the reputation of CurlyNikki (*e.g.*, via content not approved by Walton as TMLLC's "Head of Content Development"), TMLLC generated revenue that was, in part, owed to Walton as a member of TMLLC. DBIL did not cause TMLLC to remit the portion of the revenue that was owed to Walton and WMG per the LLC Agreement, but, instead, used that revenue to unduly compensate itself and others (*i.e.*, self-dealing). Moreover, DBIL, wielding its 100% voting power, improperly used TMLLC-related content to monetarily benefit itself and/or Ultra/Standard (a separate company), which meant that income otherwise subject to distribution in Walton or WMG's favor was diverted by DBIL out of TMLLC to DBIL and/or Ultra/Standard. After acting in its own financial self-interest, DBIL then refused to provide plaintiffs with accounting and other financial information regarding TMLLC, which would presumably reflect the impact of DBIL's self-dealing of assets belonging to TMLLC. In other words, DBIL hid financial information about TMLLC from plaintiffs.

74.     DBIL used it position as controlling member of TMLLC, as and plaintiffs' fiduciary, to wrongfully take gains and profits from TMLLC. By wrongfully benefitting itself, while acting as TMLLC and plaintiffs' fiduciary, DBIL committed constructive fraud. As a direct and proximate result of DBIL's constructive fraud, as alleged, plaintiffs have sustained damages in an amount to be proven at trial. Plaintiffs seek, for instance, the benefit of their bargain; because the law requires DBIL to put

Walton and WMG, the parties harmed by DBIL's fiduciary breach, in the position they would have occupied if DBIL had not constructively defrauded them. Plaintiffs also seek any available remedy in equity, to the degree that any otherwise suitable remedies at law are unavailable or are inadequate, in order to provide plaintiffs with the benefit of their bargain with DBIL, and/or to make plaintiffs whole.

## PRAYER FOR RELIEF

WHEREFORE, upon this Amended Complaint, plaintiffs pray this Court to enter judgment or allow other appropriate relief at law or in equity against defendants as follows:

(1)     Plaintiffs seek damages in excess of the jurisdictional amount of $75,000.00, and in an ultimate amount to be determined by the trier of fact;

(2)     Plaintiffs seek the benefit of their bargain with defendants;

(3)     Plaintiffs seek equitable relief from the Court in the event relief is not available at law;

(4)     Plaintiffs pray the Court to enter appropriate orders disgorging any and all ill-gotten gains that have inured to defendants as a result of their wrongful conduct;

(5)     For such pre and post-judgment interest as permitted by law;

(6)     For punitive damages upon plaintiffs' fraud-based claims;

(7)     For such other relief as the Court deems necessary or proper.

FURTHERMORE, plaintiffs demand a trial by jury on all triable claims at law or as otherwise appropriate.

Respectfully submitted, this the 19th day of October, 2018.

Counsel for plaintiffs:

/s/ Gary V. Mauney
Gary V. Mauney
**MAUNEY PLLC**
Two SouthPark Center
6135 Park South Drive, Suite 510
Charlotte, North Carolina 28210
P: 704/945-7185
F: 704/945-7101
E: garymauney@mauneypllc.com

## CERTIFICATE OF SERVICE

I, Gary V. Mauney, as counsel for plaintiffs, hereby certify that I have this day of October 19, 2018, electronically filed and served the foregoing **SECOND AMENDED COMPLAINT**, using the Court's CM/ECF system, which will send notification to the following:

### Counsel for Defendants:

Jay C. Salzman
Harris, Creech, Ward, & Blackerby, P.A.
325 Pollock Street
P.O. Drawer 1168
New Bern, NC 28563

Filed and served, this the 19th day of October, 2018.

### Counsel for plaintiffs:

/s/ Gary V. Mauney
Gary V. Mauney
**MAUNEY PLLC**
Two SouthPark Center
6135 Park South Drive, Suite 510
Charlotte, North Carolina 28210
P: 704/945-7185
F: 704/945-7101
E: garymauney@mauneypllc.com