IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-119-FL

| | | |
|---|---|---|
| WALTON MEDIA GROUP, LLC, a North Carolina Limited Liability Company, and ALICIA NICOLE WALTON, an individual, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| TEXTUREMEDIA, LLC a Delaware Limited Liability Company, a/k/a NATURALLYCURLY.COM, INC., and DEBORAH INTERNATIONAL BEAUTY, LTD, a New York Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on defendant Deborah International Beauty Ltd.'s ("DBIL") motion to dismiss for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2).[1] (DE 46). Also before the court is plaintiffs' motion for leave to file a supplemental complaint. (DE 39). The issues raised have been fully briefed by the parties, and in this posture are ripe for ruling. For the following reasons, defendants' motion to dismiss is denied, and plaintiffs' motion for leave to file supplemental complaint is granted.

### STATEMENT OF THE CASE

Plaintiffs commenced this action on March 23, 2018, by filing a verified complaint.

---

[1] Defendant DBIL's motion also states that defendant moves to dismiss under Fed. R. Civ. P. 12(b)(6). However defendant DBIL advances no arguments in its memorandum of law to support a motion under this rule. (See Def. Brief (DE 48)). Therefore, the court considers the Fed. R. Civ. P. 12(b)(2) motion only. See Local Civil Rule 7.1(e), 7.2(a).

Plaintiffs amended their complaint once on August 6, 2018, and again on October 19, 2018 pursuant to stipulation of the parties. Plaintiffs' second amended complaint alleges causes of action against defendant DBIL for breach of fiduciary duty and constructive fraud. Plaintiffs seek compensatory damages, punitive damages, and equitable relief if remedies at law are inadequate.

On October 19, 2018, plaintiffs filed the instant motion for leave to file a supplemental complaint. The proposed supplemental complaint would add additional allegations pertaining to the sale of defendant TextureMedia LLC's ("TMLLC") assets following the initiation of this action. Additionally, the supplemental complaint raises a supplemental claim of constructive fraud against defendant DBIL. Defendant DBIL filed its response in opposition, arguing that the supplemental complaint is futile because this court does not have personal jurisdiction over defendant DBIL.

In the meantime, defendant DBIL filed the instant motion to dismiss for lack of personal jurisdiction. In support of its motion, defendant DBIL argues that it does not have sufficient contacts or engage in sufficient activity within North Carolina to establish personal jurisdiction, that the transactions that are the subject of this lawsuit occurred outside North Carolina, and that defendant DBIL's alleged contacts with plaintiffs in its capacity as a member of defendant TMLLC are insufficient to establish personal jurisdiction.

Plaintiffs responded in opposition, arguing that the case arises out of defendant DBIL's contacts with the forum state, defendant DBIL's contacts with plaintiffs fall directly within the North Carolina Long-Arm Statute, defendant DBIL's conduct targeted North Carolina, and defendant DBIL cannot claim any constitutional unfairness which would preclude the court's personal jurisdiction. Plaintiffs also rely upon the declaration of plaintiff Alicia Nicole Walton (Walton Decl. (DE 51-1)) in support of their response.

Defendant DBIL replied, arguing that it has not purposely availed itself of the privilege of

conducting activities in North Carolina, plaintiffs' claims do not arise out of any alleged activities directed at North Carolina, and exercise of personal jurisdiction would not be constitutionally reasonable. In support of its reply, defendant DBIL relies upon the limited liability company operative agreement of TMI Media, LLC ("LLC Agreement" (DE 53-1)).

Plaintiffs then filed a motion for leave to file surreply. The proposed surreply specifically addressed the arguments raised in defendant DBIL's reply memorandum regarding the validity of the LLC Agreement, and whether such agreement constituted a valid contract formed in North Carolina. Defendant DBIL responded in opposition to the motion for leave to file surreply, arguing that a contract was not formed in North Carolina, and that the LLC Agreement is integral to plaintiffs' allegations and should be considered in ruling on the motion to dismiss. The court granted plaintiffs leave to file their surreply.

## STATEMENT OF FACTS

The facts alleged in the complaint[2] may be summarized as follows. Plaintiff Alicia Nicole Walton[3] ("Walton") initially had low self-esteem because of her curly hair, and after discussions with her future husband and observing similar reactions from those around her, plaintiff embraced her naturally curly hair, researched the science of how best to care for curly hair, and trained herself how to best care for and nurture her own hair. (Compl. ¶¶ 1-3). In 2008, plaintiff Walton started "CurlyNikki.com," a website initially started as a blog, which included content such as how to style hair, how to keep curly hair natural and healthy, and advocacy for women to educate themselves

---

[2] Hereinafter, all references to the "complaint" in the text and to "Compl." in citations are to the second amended complaint filed October 19, 2018 (DE 40), unless otherwise specified.

[3] Plaintiff Walton Media Group ("WMG") is a limited liability company organized under the laws of North Carolina, with its principal office location in Raleigh. (Compl. ¶ 39). Plaintiff WMG is an alter ego of Walton. Therefore, plaintiff WMG and Walton are therefore referred to interchangeably. (Id.).

3

about various hair products and treatments. (Id. ¶¶ 4-6). The website gained popularity across the United States and other countries, and plaintiff Walton soon began traveling to meet her website's readership. (Id. ¶¶ 7-8). By 2010, CurlyNikki.com had become the most heavily trafficked natural hair website in the world, giving plaintiff Walton prominence as a "social media influencer" and prompting her appearance across many print sources and television shows to share her message and insights. (Id. ¶¶ 9, 10).

In late 2010, defendant NaturallyCurly.Com, Inc.[4] ("NCCI") approached plaintiff Walton, expressing interest in CurlyNikki.com. (Id. ¶ 11). "NaturallyCurly.Com" was dedicated to topics of concern or discussion among women with naturally curly hair, and defendant NCCI was interested in moving forward in business with plaintiff Walton to enhance their internet advertising business and product endorsements. (Id. ¶¶ 12, 13). In August and September 2010, plaintiff Walton and defendant NCCI discussed various ways they might combine forces, including raising venture capital. (Id. ¶ 14). During this time, a meeting between defendant NCCI and plaintiff occurred in Raleigh. (Id.). From 2010 through fall of 2015, plaintiff Walton and defendant NCCI worked together in a sometimes unsteady relationship. (Id. ¶ 15).

TextureMedia, Inc., the parent company of NCCI, began shopping its portfolio of assets in 2013, seeking to broker a sale of defendant NCCI, without disclosing its plans to plaintiff Walton. (Id. ¶ 16). On or about August 14, 2015, Michelle Breyer ("Breyer"), the co-founder of Naturally Curly.com, met with plaintiff Walton and allegedly represented that TextureMedia had an urgent need for capital and had only one available buyer, a New York-based distributor of hair care and beauty products known as "Ultra/Standard" (formally, "Ultra Standard Distributors, Inc." and f/k/a

---

[4] The caption of the complaint indicates that defendant TMLLC was formerly known as NaturallyCurly.Com, Inc. (See Compl. at 1).

"Olla Beauty Supply, Inc."). (Id. ¶¶ 17, 18). Breyer also allegedly represented that, should plaintiff Walton publicly support the sale, plaintiff Walton would be given an equity and control position in the post-acquisition entity, she would be treated as a "partner" in the new enterprise, and that she would be on executive footing with any other "partners" in the company, and plaintiff Walton's previous commitments to TextureMedia would be favorably changed to reflect her partnership in the newly formed company. (Id ¶ 19).

In mid-August 2015, Breyer arranged a meeting in the Bellport, New York offices of Ultra/Standard and defendant DBIL, which was attended by Breyer, plaintiff Walton, Ryan Alberta ("Alberta"), the vice president of Ultra/Standard, and Michael Ross ("Ross"), the president of Ultra/Standard and the vice prsident and representative of defendant DBIL. (Id. ¶ 20). At this time, the successor entity to TextureMedia had already been formed - defendant TMLLC. (Id.). Defendant TMLLC would be under the 100% voting control of DBIL (through Ross). (Id.). During the meeting, Breyer, Alberta, and Ross, as promoters, agents, and those in control of defendant TMLLC, allegedly made several representations, such as making plaintiff Walton the "Head of Content Development" at defendant TMLLC, making plaintiff Walton a "partner" in the new company and would share revenue from that company, and giving plaintiff Walton various forms of discretion over CurlyNikki.com. (See id. ¶ 20(a) - (i)).

Shortly after plaintiff Walton's meeting with Breyer, Alberta, and Ross, Ultra/Standard drafted and presented plaintiff Walton with a limited liability company agreement (the "LLC Agreement") for defendant TMLLC that would make her a 2.5% nonvoting member of that (newly formed) company. (Id. ¶ 21). The LLC Agreement appeared consistent with the representations made in the meeting. (See id. ¶ 21(a) - (I)). Based on the representations in the LLC Agreement, and other similar representations made by Breyer, Alberta, and Ross at the Bellport meeting,

5

plaintiff Walton agreed to support the TextureMedia acquisition and sign on as a member and as Head of Content Development at defendant TMLLC. (Id. ¶ 22).

On or about September 21, 2015, TextureMedia, the parent company of defendant TMLLC, was acquired by Ultra/Standard, thereby giving defendant DBIL 100% voting control over defendant TMLLC. (Id. ¶ 23). That same day, Ultra/Standard and defendant TMLLC issued a post-acquisition press release wherein they quoted plaintiff Walton as supporting the acquisition of defendant TMLLC. (Id. ¶ 24).

Following the acquisition, defendants allegedly reneged on their representations by Breyer, Alberta, and Ross. (Id. ¶ 25). Crista Bailey ("Bailey"), the CEO of defendant TMLLC, immediately started making changes to the development of content on CurlyNikki.com at defendant DBIL's control and direction. (Id.). Some of the changes included not allowing guest bloggers on the site, devoting only $450 per month in funding to the website where NaturallyCurly.com had a monthly budget of $60,000 - $100,000 per month, and allowing CurlyNikki.com to fall into disrepair by allowing many dead links to appear on the website. (Id. ¶¶ 26-27). Defendant TMLLC's executive team also began a campaign to cause plaintiff Walton to stop making appearances on shows like "The Dr. Oz Show" and told plaintiff Walton to appear on shows with predominately African-American viewers. (Id. ¶ 28).

In the later part of 2016, defendant TMLLC began to divert advertising revenue away from CurlyNikki.com and to their other websites in the Ultra/Standard portfolio. (Id. ¶ 33). Plaintiff Walton requested a meeting with Ross. (Id. ¶ 29). Ross stated it was "Bailey's job to allocate funds as she sees fit and that he would not interfere with her conduct." (Id.). Shortly thereafter, Bailey was removed as plaintiff Walton's primary point of contact at defendant TMLLC, and Bailey departed as CEO of defendant TMLLC in January 2017. (Id.).

6

In March 2017, defendant TMLLC allegedly told plaintiff Walton that it would increase the funding of the CurlyNikki.com website and make other changes to improve the site if plaintiff Walton agreed to make personal appearances for defendant TMLLC's other lines of business, as well as promote a book authored by Breyer. (Id. ¶ 30). Defendant TMLLC used plaintiff Walton's likeness and the CurlyNikki name to endorse and otherwise secure advertising and retail revenue, without consulting plaintiff Walton or even asking her if she would voluntarily make any such endorsements. (Id. ¶ 31).

Following Ultra/Standard's acquisition of defendant TMLLC in 2015, defendant TMLLC has sporadically issued K-1 tax forms to plaintiff Walton Madia Group, LLC ("WMG"), only issuing one form over almost two and a half years with no explanation. (Id. ¶ 34). Defendant TMLLC, under defendant DBIL's sole control, failed to provide plaintiff Walton the GAAP financials mandated by the LLC Agreement, and failed to make partnership distributions to plaintiff Walton in the manner called for by the LLC Agreement. (Id. ¶¶ 35-36).

Additional facts pertinent to the instant motions will be discussed in the analysis below.

## COURT'S DISCUSSION

A.   Standard of Review

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of a claim for lack of personal jurisdiction. "When a district court considers a question of personal jurisdiction based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of making a prima facie showing in support of its assertion of jurisdiction." Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014). At this stage, the court "must construe all relevant pleading allegations in the light most favorable to plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989);

see Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir.1993)( "[T]he district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor.").

B.   Analysis

   1.   Defendant DBIL's Motion to Dismiss

Defendant DBIL asserts that it is not subject to the personal jurisdiction of this court, and therefore the claims against it must be dismissed. Plaintiffs contest their assertions.

"A lawful assertion of personal jurisdiction over a defendant requires satisfying the standards of the forum state's long-arm statute and respecting the safeguards enshrined in the Fourteenth Amendment's Due Process Clause." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012). Where, as here, "North Carolina's long-arm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause, . . . the dual jurisdictional requirements collapse into a single inquiry" into whether personal jurisdiction comports with due process. Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001).

The due process inquiry "can be undertaken through two different approaches – by finding specific jurisdiction based on conduct connected to the suit or by finding general jurisdiction" based on "continuous and systematic" activities. ALS Scan, Inc. v. Digital Serv. Consul., Inc., 293 F.3d 707, 711 (4th Cir. 2002). Here, plaintiff asserts specific jurisdiction. (Compl. ¶ 45; see Walton Decl. (DE 51-1)).

"To decide whether specific jurisdiction exists, we examine (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the

exercise of personal jurisdiction would be constitutionally reasonable." Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004) (quotations omitted); see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-76 (1985). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 571 U.S. 277, 283-84 (2014) (quotations omitted). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Id. at 284.

A single contract may demonstrate purposeful availment of plaintiff's forum. Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 190 (4th Cir. 2016). However, to serve as a basis for personal jurisdiction "the continuing obligations" underlying the contract must "strengthen a defendant's contacts with the plaintiff's forum." Id. at 191. In the business context, courts consider factors including, but not limited to:

> (1) whether the defendant maintains offices or agents in the forum state; (2) whether the defendant owns property in the forum state; (3) whether the defendant reached into the forum state to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (5) whether the parties contractually agreed that the law of the forum state would govern disputes; (6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; (7) the nature, quality and extent of the parties' communications about the business being transacted; and (8) whether the performance of contractual duties was to occur within the forum.

Sneha Media & Entm't, LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 198 (4th Cir. 2018).

"[E]ven assuming the requisite minimum contacts between [North] Carolina and [defendant], notions of fair play and substantial justice [must not] counsel against jurisdiction." Foster v. Arletty 3 Sarl, 278 F.3d 409, 415 (4th Cir. 2002). In other words, the exercise of personal jurisdiction must be "constitutionally reasonable." Nolan, 259 F.3d at 216. Generally, such an analysis ensures that

9

litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 296 (4th Cir. 2009). "[A]t least three other relevant factors—the burden on [defendant], the interests of the . . . forum state, and [plaintiff's] interests in obtaining relief—inform the reasonableness analysis." Id.

Here, plaintiffs assert several bases for personal jurisdiction, including 1) defendant DBIL faxed plaintiffs the LLC Agreement on or about August 22, 2015, in Durham, North Carolina, for the purpose of executing and accepting that agreement; 2) defendant DBIL's attorney called plaintiff Walton while she was in North Carolina to encourage her to execute the LLC Agreement and join the company; 3) defendant TMLLC agreed to substitute plaintiff WMG as a member of defendant TMLLC; 4) plaintiff WMG maintains a Raleigh business address; 5) over the last two years, defendant DBIL's attorneys have contacted plaintiff Walton while she was in Reidsville, North Carolina, regarding legal matters related to her website postings for defendant TMLLC; and 6) defendant DBIL used its sole control over defendant TMLLC to sell all of the asserts of the company to a third party and give the proceeds to itself without regard for the rights of plaintiff WMG. (Walton Decl. (DE 51-1) ¶¶ 5-8, 10).

Plaintiffs have produced no evidence that defendant DBIL maintains offices or agents in the forum state, nor that defendant DBIL owns property in the state. The LLC Agreement for defendant TMLLC provides that Delaware law, rather than North Carolina law, governs the LLC Agreement.[5] (LLC Agreement (DE 53-1) ¶ 10.6). Additionally, there is no evidence that defendant DBIL met

---

[5]Since defendant TMLLC's LLC Agreement attached by defendant DBIL to support of its motion to dismiss is integral to the complaint, explicitly relied upon in the complaint, and is authentic, the court considers it in ruling on the motion to dismiss. See Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 68 n.1 (4th Cir. 2016); (Compl. ¶ 42; LLC Agreement (DE 53-1)).

in person in with plaintiffs in the forum state. (See Walton Dec. (DE 51-1)).

Considering all jurisdictional factors together, the facts alleged by plaintiff create a reasonable inference that defendant DBIL purposefully availed itself of the privilege of doing business in North Carolina. Defendant DBIL sent plaintiff Walton the LLC Agreement on August 22, 2015 by fax to North Carolina, for the purpose of executing and accepting the LLC Agreement. (Walton Decl. (DE 51-1) ¶ 5). Defendant DBIL, through counsel, called plaintiff Walton in North Carolina to encourage her to sign the LLC Agreement. (Walton Decl. (DE 51-1) ¶ 5). These contacts were initiated by defendant DBIL, and ultimately led to an agreement which anticipated a long lasting relationship among the members. See Sneha Media & Entm't, 911 F.3d at 199.

Defendant DBIL's purposeful availment of doing business in North Carolina does not end with initiating the LLC Agreement. The LLC Agreement in this case provides that, except in limited circumstances, "no Member may Transfer any of its Membership Interests without the prior written approval of all of the Managers." (LLC Agreement (DE 53-1) ¶ 6.1(a)). Ross, defendant DBIL's vice-president, was designated by defendant DBIL and the other members as a manager of defendant TMLLC (LLC Agreement (DE 53-1) at 30). Therefore, it is reasonable to infer that when defendant TMLLC approved plaintiff Walton transferring her interest to plaintiff WMG, defendant DBIL consented to this transfer through Ross, who represented its interests as both controlling member and manager of the LLC. (See Walton Decl. (DE 51-1) ¶ 7; LLC Agreement (DE 53-1) ¶ 6.1(a), at 30). Plaintiff WMG has continued to maintain a Raleigh business address. (Walton Decl. (DE 51-1) ¶ 7). Therefore, it is foreseeable that, by transferring plaintiff Walton's interest to plaintiff WMG, defendant DBIL as controlling member of defendant TMLLC would continue to have ongoing contacts with North Carolina. Indeed, plaintiff Walton states that, after the transfer, "[defendant] DBIL caused defendant TMLLC to interact with me through [plaintiff] WMG. [Plaintiff] WMG is

11

a North Carolina Company." (See Walton Decl. (DE 51-1) ¶¶ 7, 8).

Finally, plaintiffs assert that defendant DBIL allegedly violated plaintiff WMG's rights by using its control in defendant TMLLC to sell defendant TMLLC's assets and take the money "with no regard for the interests or rights of other LLC members," including plaintiff WMG. (Walton Decl. (DE 51-1) ¶ 10). Based on these facts, defendant DBIL has contacts with North Carolina that touch and concern the beginning, middle, and end of plaintiffs' relationship to defendant TMLLC.

Drawing all reasonable inferences in favor of plaintiff, defendant DBIL reached into North Carolina to solicit or initiate business, deliberately engaged long-term business activities in North Carolina by entering an LLC Agreement with parties in North Carolina as a controlling member, maintained communications with plaintiffs in North Carolina over the several years they were in business together, and owed contractual duties to plaintiff Walton, and later plaintiff WMG, by virtue of the LLC Agreement and representations that its representatives allegedly made. See Sneha Media & Entm't, 911 F.3d at 198. Consequently, defendant DBIL purposefully availed itself of the privilege of doing business in North Carolina.

Plaintiffs allege breach of fiduciary duty and constructive fraud claims arising out of the LLC Agreement and defendant DBIL's controlling membership over defendant TMLLC in this case. (Compl. ¶¶ 64-74). Therefore, defendant DBIL's contacts with North Carolina as discussed above relate to the causes of action in question, satisfying the second requirement for personal jurisdiction.

Finally, exercise of personal jurisdiction is constitutionally reasonable. North Carolina has an interest in protecting the alleged contract and property rights of its citizens. Moreover, plaintiffs' choice of forum must be given weight in the reasonableness analysis. The court is also satisfied, given the manner in which the case has proceeded thus far, that litigation in North Carolina is "not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in

comparison to his opponent." CFA Inst., 551 F.3d at 296.

Defendant DBIL attempts to challenge the applicability of the North Carolina long arm statute to this case. However, "North Carolina's long-arm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause, . . . [therefore] the dual jurisdictional requirements collapse into a single inquiry." See Nolan, 259 F.3d at 215. The court has found that plaintiffs have made a prima facie showing of personal jurisdiction under the due process clause. Therefore, defendant DBIL's arguments as to the long arm statute are unpersuasive.

Defendant DBIL also asserts that Consulting Eng'rs supports its assertion the court lacks personal jurisdiction, where contacts with the forum state consisted of a few phone calls. (Def. Mem. (DE 48) at 8 (citing Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 281 (4th Cir. 2009)). However, Consulting Eng'rs is inapplicable to this case because here, the record supports the assertion that defendant DBIL initiated contact with plaintiffs in North Carolina regarding the LLC Agreement, and defendant DBIL maintained an ongoing business relationship with plaintiffs, one of whom consistently remained based in North Carolina. Compare Consulting Eng'rs, 561 F.3d at 281-82 with (Walton Decl. (DE 51-1) ¶¶ 5-8).

Finally, defendant DBIL contends that personal jurisdiction is inappropriate because plaintiff Walton signing the LLC Agreement alone does not unilaterally create a binding contract. (See Def. Reply (DE 53) at 3-4). Although the parties dispute whether a binding contract was in fact created when plaintiff Walton executed the LLC Agreement, such a dispute has no bearing on the question of personal jurisdiction in this case. It is reasonable to infer that when defendant DBIL sent plaintiff Walton the LLC Agreement for her signature and approval, and called her through counsel to encourage her to sign it, defendant DBIL intended to create a binding contract when it reached out

to plaintiff Walton. (See Walton Decl. (DE 51-1) ¶¶ 5-6). Additionally, defendant DBIL has other relevant contacts with North Carolina, as discussed above.

For these reasons, the court denies defendant DBIL's motion to dismiss for lack of personal jurisdiction.

    2.    Plaintiffs' Motion for Leave to File Supplemental Complaint

Plaintiffs seek leave to file a supplemental complaint adding an additional claim for constructive fraud. The proposed claim would raise a cause of action against defendant DBIL for conducting an asset sale by defendant TMLLC, failing to disclose required documentation to members, providing allegedly false financial records, and allegedly taking the proceeds when at least some of them should have been distributed to plaintiffs. (See Prop. Supp. Compl. (DE 39-1) ¶¶ 21-27).

"On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). "Leave to amend should be freely granted, and should be denied only where good reason exists . . . , such as prejudice to defendants." Franks v. Ross, 313 F.3d 184, 198 n.15 (4th Cir. 2002) (internal quotations omitted).

Here, plaintiffs seek to supplement their existing constructive fraud claims with additional allegations regarding defendant DBIL forcing an asset sale of defendant TMLLC. The events in the supplemental complaint occurred after the filing of this action, and provide additional allegations regarding plaintiffs' complaint. (Compare Compl. ¶¶ 69-74 with Prop. Supp. Compl. (DE 39-1) ¶¶ 21-27).

Defendant DBIL argues leave to supplement should be denied because such supplemental complaint would be futile, given that the court lacks personal jurisdiction. For the reasons stated

above, the court rejects defendant DBIL"s argument. Plaintiffs' motion for leave to file supplemental complaint is granted.

## CONCLUSION

Based on the foregoing, defendant Deborah International Beauty Ltd.'s motion to dismiss for lack of personal jurisdiction (DE 46) is DENIED. Plaintiffs' motion for leave to file supplemental complaint (DE 39) is GRANTED. Plaintiffs are DIRECTED to file the proposed supplemental complaint and supporting documents within 5 days of the date of this order. Defendant Deborah International Beauty Ltd. is DIRECTED to respond to plaintiffs' supplemental pleading within 14 days thereafter.

SO ORDERED, this the 25th day of January, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge